UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------X

UNITED STATES OF AMERICA,

– against –

RICHARD COPELAND,

              Defendant.

---------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ MAY 0 5 2005 ★

BROOKLYN OFFICE

MEMORANDUM,
JUDGMENT AND ORDER
01-CR-1453

APPEARANCES:

For the Government:

      Roslynn R. Mauskopf
      United States Attorney
      One Pierrepont Plaza
      14th Floor
      Brooklyn, New York 11201
      By: Scott Dunn

For the Defendant:

      Michael Padden
      Federal Defender's Division
      Legal Aid Society
      16 Court Street
      Brooklyn, New York 11241

JACK B. WEINSTEIN, Senior District Judge:

## Table of Contents

I.  Introduction .................................................................................................................5

II.  Facts.........................................................................................................................6

    A. Family History.................................................................................................6

    B. Criminal Conduct.............................................................................................6



C. Deportation Hearings and Deportation..................................................9

D. Motion to Reopen....................................................................11

E. Reentry into the United States and Charge of Illegal Reentry.....................12

F. Decision by District Court on Motion to Dismiss Indictment.......................12

G. Government's Appeal from Dismissal and Remand....................................14

   1. Court of Appeals Decision.....................................................14

      a. Section 1326(d)(1): Exhaustion of Administrative Remedies................14

      b. Section 1326(d)(2): Denial of Judicial Review...........................14

      c. Section 1326(d)(3): Fundamental Unfairness..............................15

III. Law....................................................................................16

A. Illegal Reentry and Collateral Attack............................................16

B. Fundamental Unfairness of Entry of Deportation Order.............................17

   1. Standard for Prejudice.......................................................17

   2. Quantifying Prejudice........................................................18

C. Means of Determining Prejudice: Balancing Positive and Negative Factors..........22

D. Unusual or Outstanding Countervailing Equities...................................23

E. Rehabilitation..................................................................25

F. Cases Involving Similarly Situated Aliens........................................26

   1. Court of Appeals Cases.......................................................27

      a. Illegal Reentry.........................................................27

      b. Reviewing BIA Decisions.................................................30

2. District Court Cases..................................................................38

3. Board of Immigration Appeals......................................................40

    a. Precedential Cases.............................................................40

    b. Unpublished Cases............................................................50

    c. Challenge of "Actual Cases".................................................57

IV. Evidence at Hearing.................................................................63

  A. Positive and Adverse Factors......................................................63

    1. Mother: Ivy Johnson.........................................................63

    2. Uncle: Donald Johnson.......................................................65

    3. Common Law Mother-in-Law: Beverly Lovell..............................68

    4. Aunt: Cymlyn Chambers.....................................................70

    5. Proffered Testimony of Monique Brown: Beverly Lovell............71

    6. Aunt: Alesia Yoyo..........................................................74

    7. Defendant: Richard Copeland.................................................75

      a. Family History..............................................................75

      b. Work History...............................................................76

      c. Common Law Wife and Children ......................................77

      d. Criminal History ..........................................................78

    8. Immigration Judge: Keith Williams..........................................88

V. Application of Law to Facts..........................................................102

  A. Balancing Factors...............................................................102

    1. Generally ..................................................................102

2. Adverse Factors..............................................................................104

    a. Nature of Exclusion Ground at Issue..................................105

    b. Presence of Additional Immigration Law Violations........105

    c. Criminal Record and its Nature,
       Recency, and Seriousness...........................................105

    d. Presence of Other Evidence of Bad Character...................108

3. Positive Factors..............................................................................111

    a. Family Ties........................................................................111

    b. Residence of Long Duration...............................................113

    c. Arrival at a Young Age.......................................................114

    d. Hardship to the Alien and His Family.................................114

    e. Armed Forces Service.........................................................115

    f. Employment History............................................................115

    g. Community Service..............................................................115

    h. Property or Business Ties.....................................................115

    i. Other Evidence of Good Character.......................................116

    j. Rehabilitation......................................................................116

    k. Balancing............................................................................116

4. Actual Cases..................................................................................117

VI. Conclusion.............................................................................................119

## I. Introduction

This case raises the issue of how a district court can determine whether the fact that a deportee was denied due process in deportation hearings prejudiced him – *i.e.*, whether the result would not have been deportation if no constitutional violation had occurred. As indicated below, *see infra* Part III.F.3.c., a readily applied – and probably fairer – test would require the defendant to prove only that his deportation resulted from a due process denial serious enough to make "the entry of the [deportation] order . . . fundamentally unfair." 8 U.S.C. § 1326(d)(3).

The rule of law adopted by the United States Court of Appeals for the Second Circuit requires the district court to undertake the highly speculative task of determining whether, absent the constitutional violation, the immigration judge would have ordered the defendant deported. In effect, this enterprise necessitates a present reconstruction of a hypothetical deportation hearing in 1996. It requires the court to accurately predict, in the deportation context, what would have happened at another time, in another place, with different lawyers, and before another unknown judge, using variable and subjective factors.

An indictment charging Richard Copeland with illegal reentry into the United States was dismissed by this court based on a finding that the underlying prior ordered deportation was not consistent with due process. *See United States v. Copeland*, 228 F. Supp. 2d 267 (E.D.N.Y. 2002). Though the United States Court of Appeals for the Second Circuit was in agreement that due process had been denied, it nevertheless vacated dismissal of the indictment. *See United States v. Copeland*, 376 F.3d 61, 75 (2d Cir. 2004). Concluding that the law required both denial of due process and a showing of prejudice before the dismissal of an illegal re-entry indictment,

5

the Court of Appeals remanded the case to the district court for an evidentiary hearing and findings on the question of whether the fundamental procedural error in the defendant's deportation hearing had been prejudicial.

The court conducted a full evidentiary hearing. It finds that the defendant was not "prejudiced." The decision is based on a determination, by a standard of clear, unequivocal and convincing evidence – 80% or more probability – that had the section 212(c) hearing and administrative appeal before deportation been properly conducted by an immigration judge, the defendant would have been ordered deported. Accordingly, the indictment is reinstated.

## II. Facts

A. Family History

The defendant is a citizen of Jamaica. He was born on November 11, 1969. On July 21, 1982, when he was twelve years old, he entered the United States as a lawful permanent resident. His grandmother, a naturalized citizen, had adopted the defendant in 1978, and it was through her petition that the defendant was able to enter the country legally. He left only distant relatives in Jamaica and did not return there until 1998, upon his deportation at the age of 27. At the time of deportation, he resided in this country with his two children, Richard Copeland Jr. and Tyler Brown, then ages 11 and 4, and their mother, Monique Brown. The children and mother are United States citizens.

B. Criminal Conduct

The defendant was convicted of four New York state crimes prior to his deportation: (1) disorderly conduct; (2) attempted criminal sale of a controlled substance in the third degree; (3) criminal possession of a weapon in the third degree; and (4) criminal possession of a weapon in

6

the second degree. He was sentenced to three days imprisonment for the disorderly conduct conviction. He served the sentences for the three other crimes concurrently, from October 13, 1995 to September 23, 1998 – just under three years.

The convictions themselves do not adequately reflect the severity of the criminal activity. A more thorough chronology is required to place the crimes in context. It was not uncommon for immigration judges to conduct similar inquiries in assessing section 212(c) applications; they were authorized to go behind records of conviction to ascertain the underlying facts. *See, e.g.,* *Matter of Roberts,* 20 I. & N. Dec. 294, 301 (BIA 1991) ("[I]nquiry may be had into the circumstances surrounding the commission of the crime in order to determine whether a favorable exercise of discretion is warranted [.] [I]t is impermissible [however] to go behind a record of conviction to reassess an alien's ultimate guilt or innocence.").

On May 18, 1988, within six years of his admission into the United States, the defendant was arrested for grand larceny of a car, criminal possession of stolen property, and unauthorized use of a vehicle. At the time of his arrest, the defendant provided a social security number belonging to an unrelated individual residing in Buffalo. On September 16, 1988, having failed to appear for a scheduled court proceeding, a bench warrant was issued for his arrest. The defendant ultimately pled guilty to disorderly conduct, following his arrest on March 22, 1989.

A March 22, 1989 arrest was for criminal possession of a controlled substance and illegal possession of a firearm. The defendant again provided a false social security number. He also indicated that he was born in Trinidad and Tobago. The social security number provided by the defendant in that instance belonged to a woman residing in Brooklyn. When the defendant again failed to appear on the date set by the court, another warrant was issued for his arrest.

On February 9, 1993, the defendant was arrested and indicted on multiple counts related to the criminal sale and possession of controlled substances. At the time of his arrest, Richard Copeland indicated that his name was Rohan Brown, thereby avoiding detection as a fugitive on the March 1989 charges. At an evidentiary hearing before this court, defendant testified that he received probation, was told to report to the probation officer, but never did so out of concern that the probation officer would discover the outstanding warrant for his 1989 arrest. *See* Mar. 24, 2005 Hrg. Tr. at 84. As a result, another bench warrant was issued.

On September 16, 1995, the defendant was arrested for attempted murder, first degree attempted robbery, first and fourth degree assault, and criminal possession of a weapon in the second and third degrees. The conduct underlying the arrest involved serious violence. The defendant pulled a man from a car at gunpoint, demanded money, and shot him in the throat when he made an effort to escape. The victim was paralyzed as a result of the shot. At the time of his arrest, Richard Copeland indicated that his name was Richard Hyatt, and falsely claimed to be a United States citizen.

Following his fourth arrest, the state sought convictions for the charges which he had evaded while a fugitive for more than six and one-half years. On October 13, 1995, the defendant pled guilty to criminal possession of a weapon in the third degree, based on his March 22, 1989 arrest. He was sentenced to a year in prison. On October 16, 1995, he pled guilty to attempted criminal sale of a controlled substance in the third degree, based on his 1993 arrest, and was sentenced to one year. On October 27, 1995, the defendant pled guilty to criminal possession of a weapon in the second degree, relating to his arrest for the September 16, 1995 shooting. He was sentenced to 1½ to 4½ years in prison. Copeland served his three felony

8

sentences concurrently; all resulted from guilty pleas.

C. Deportation Hearings and Deportation

While the defendant was incarcerated, the INS initiated deportation proceedings based on his conviction for the February 9, 1993 attempted criminal sale of a controlled substance. A hearing was conducted before an Immigration Judge ("IJ") on August 7 and November 27, 1996. At the August hearing, the IJ informed the defendant that he had a right to an attorney and that he was entitled to appeal any decision by the IJ within 30 days of a decision. The IJ also told the defendant that because he was an alien, he would be deportable if the INS proved that he had been convicted of attempted sale of a controlled substance. The IJ stated that "[u]nder current law there is no waiver for deportability if you're, [sic] had been convicted of, of violation of a controlled substance law," because "the law changed April 1996 a couple a months ago . . . and the new law says if you have a conviction for narcotics you're not eligible for any form of relief."

The defendant apparently attempted to ask whether the date of his conviction would have an effect on his eligibility for a waiver of deportation by suggesting that he had committed the crimes and had been convicted before adoption of the new provision:

> COPELAND: So, so that law it, it all depends umm . . . if it was before April 19 . . .
> JUDGE: It doesn't depend on when the crime was com. . .
> COPELAND: Oh?
> JUDGE: No! No! Goes by whether . . . if you have . . .
> COPELAND: . . . (unintelligible) . . . what's in your record.
> JUDGE: Right. Alright, that's what the law says now. As if and it says that. Okay? But speak to lawyers about it . . . .

9

The IJ then adjourned the hearing for three months to give the defendant time to find an attorney.

When the hearing resumed on November 27, 1996, the defendant again appeared *pro se*.
He admitted that he was not a citizen of the United States, that he was a citizen of Jamaica, and
that he had been convicted of an attempted criminal sale of a controlled substance on September
27, 1993. The IJ found the defendant "deportable from the United States as charged." The
following colloquy then occurred:

> JUDGE: There's no relief available to you anymore
> because the law changed in April. And the
> new law said that if you have a conviction
> for a controlled substances [sic] you're
> deportable and there's no relief. So I feel I
> have no alternative but to order you deported
> to Jamaica. You could accept this decision
> as a final decision or you can appeal my
> decision. Which do you prefer to do?
>
> COPELAND: I will accept this decision.

The defendant did not file an appeal with the Board of Immigration Appeals ("BIA") within the
30 day time limit. He remained in the United States because of his incarceration.

The "new law" referred to by the IJ was actually two laws: the Antiterrorism and
Effective Death Penalty Act of 1996, ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, enacted
on April 24, 1996, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996
("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, enacted on September 30, 1996
(collectively, "the 1996 Amendments"), which amended the Immigration and Nationality Act
("INA"), 66 Stat. 163, as amended, 8 U.S.C. § 1101 *et seq.*

Prior to these amendments, the Attorney General had broad discretion to cancel
deportation orders for aliens who met certain residence requirements and had not served five

years in prison for an aggravated felony. (Recall that defendant served considerably less than five years in total.) *See* 8 U.S.C. § 1182(c) (repealed 1996); *INS v. St. Cyr*, 533 U.S. 289, 296-97 (2001). AEDPA amended section 1182(c) to render aliens who pled guilty to aggravated felonies ineligible for section 212(c) discretionary relief from deportation. *See* AEDPA § 440(d). IIRIRA then repealed section 212(c), *see* IIRIRA § 304(b), replacing it with a new section granting the Attorney General authority to cancel removal only for a narrowly defined class of inadmissible or deportable aliens, not including persons "convicted of any aggravated felony." *Id.*

At the time of the defendant's deportation hearing, the BIA's position was that the 1996 Amendments applied retroactively to non-citizens, like him, who, prior to their enactment, had pled guilty to aggravated felonies. *See In re Soriano*, 21 I. & N. Dec. 516, 534, 1996 WL 426888 (BIA June 27, 1996), *vacated on other grounds*, 1997 WL 33347804 (Op. Atty Gen. Feb. 21, 1997). The IJ's statement to the defendant that new laws had rendered him ineligible for relief was based on *Soriano*.

> During 1997 and 1998, however, several courts in this circuit and elsewhere ruled that Section 440(d) could not be applied retroactively in Copeland's circumstances. The Supreme Court eventually agreed, holding that Section 440(d) could not be applied retroactively to aliens who pled guilty to crimes prior to 1996 that made them ineligible for Section 212(c) relief under the 1996 Amendments.

*United States v. Copeland*, 376 F.3d 61 (2d Cir. 2004) (citations omitted).

D. Motion to Reopen

On September 22, 1998, following his deportation hearing, but before the *St. Cyr* decision, the defendant filed a motion to reopen the proceedings and for a stay of deportation under section 212(c). He based his motion in part on the argument that the IJ had breached his

obligation, under section 242.17(a) of Title 8 of the Code of Federal Regulations, to inform him

of his eligibility for section 212(c) relief. The same IJ denied the defendant's motion to reopen

on the ground that, although section 212(c) relief remained available to aliens whose deportation

proceedings began prior to the passage of AEDPA, the defendant was ineligible for section

212(c) relief because his deportation proceedings began after its passage.

The defendant appealed the IJ's decision to the BIA on October 6, 1998. He argued that

he was eligible for section 212(c) relief. On November 23, 1998, *before the BIA had considered

his appeal*, he was deported to Jamaica. On May 25, 1999, the BIA dismissed the defendant's

appeal as moot under section 3.6(b) of Title 8 of the Code of Federal Regulations because he had

already been deported.

E. Reentry into the United States and Charge of Illegal Reentry

The defendant reentered the United States by February 22, 1999, at the latest. On

December 1, 2001, he was arrested. He was indicted for illegal reentry. 8 U.S.C. §§ 1326(a),

(b)(2); 18 U.S.C. § 3551 *et seq*. On March 27, 2002, the defendant moved to dismiss the

indictment on the grounds that his deportation order, an element of the crime of illegal reentry,

was invalid.

F. Decision by District Court on Motion to Dismiss Indictment

At a hearing before this court, the defendant argued that he was inaccurately advised of

his right to appeal when the IJ incorrectly told him that no relief was available because of the

1996 Amendments. The district court scheduled another hearing to determine whether the

defendant "really didn't appreciate that he had a right to appeal[,] having been overborne" by the

IJ. At that hearing, the court listened to tapes of the defendant's deportation hearings, heard

12

testimony from an INS agent about the defendant's criminal history, and inquired about defendant's age and education at the time of his deportation hearing. The court found that the defendant's will was not overborne and that he made a rational decision not to appeal based upon the advice he had then received, even though it ultimately turned out to be incorrect. The court also found that the IJ effectively indicated to the defendant that an appeal would be futile, and that the defendant rationally decided not to waste his effort by appealing.

The district court dismissed the indictment on the ground that the underlying deportation order violated the defendant's due process rights and therefore could not be the basis for the prior deportation element in the illegal reentry charge. *United States v. Copeland*, 228 F. Supp. 2d 267, 272 (E.D.N.Y. 2002). It noted that, under section 1326(d), a deportation order could be collaterally challenged in an illegal reentry case if the non-citizen defendant: (1) exhausted administrative remedies; (2) was deprived of the opportunity for judicial review; and (3) showed that the proceeding was fundamentally unfair. *Id.* at 270 (citing 8 U.S.C. § 1326(d)). The defendant was deemed to have satisfied the exhaustion requirement based on the conclusion that, though he had not appealed to the BIA, any attempt to do so would have been futile, given the then-current BIA interpretation of AEDPA. *Id.* at 271. The court concluded that the defendant was denied judicial review because the applicable transitional rules of the IIRIRA barred direct judicial review of deportation orders against aliens deported for narcotics offenses. *Id.* Finally, the defendant's deportation order was found to be "fundamentally unfair" because the IJ "not only failed to advise the defendant of the existence of discretionary relief, but affirmatively misled him by indicating he was ineligible for such relief." *Id.* at 271-72. The court concluded that this unfairness was prejudicial to the defendant because there was a "reasonable likelihood"

13

that he would have been granted section 212(c) relief. *Id.* Finding that the requirements of section 1326(d) were satisfied, this court dismissed the indictment.

G. Government's Appeal from Dismissal and Remand

1. Court of Appeals Decision

a. Section 1326(d)(1): Exhaustion of Administrative Remedies

The district court had found that since an appeal to the BIA would have been futile in light of *Soriano*, the defendant had sufficiently fulfilled the exhaustion requirement of section 1326(d)(1). The Court of Appeals for the Second Circuit noted that it had since held that there is no futility exception, with one minor qualification, to statutory exhaustion requirements. *Copeland*, 376 F.3d at 66. It concluded, however, that under its caselaw, the motion to reopen the deportation hearing and the defendant's appeal from the denial of that motion satisfied the exhaustion requirement of section 1326(d). *Id.* at 67.

b. Section 1326(d)(2): Denial of Judicial Review

The Court of Appeals agreed with the district court that under section 1326(d)(2) the defendant was required to demonstrate that he was denied an opportunity for judicial review. The district court had determined that the defendant was denied judicial review because the applicable transitional rules of IIRIRA barred direct judicial review of deportation orders against aliens deported for narcotics offenses. The Court of Appeals noted that the defendant nevertheless may have had the right to seek judicial relief "by way of habeas corpus." *Id.* at 68.

It ultimately concluded that where habeas review is potentially available, an opportunity for judicial review will still be deemed to have been denied where the interval between entry of the final deportation order and the physical deportation is too brief to afford a realistic possibility

of filing a habeas petition. *See id.* at 69. It reasoned that where no realistic opportunity for judicial review by way of habeas review existed, an alien's failure to seek such review should not be deemed to preclude a collateral attack on a deportation order under section 1326(d)(2). The appellate court concluded that "[i]n the present case, Copeland had no realistic opportunity for habeas review not only because of the lack of time but also because of the legal uncertainties as to the availability of habeas review." *Copeland*, 376 F.3d at 69. It held that "Copeland's resort to administrative remedies was not unreasonable" and that "his opportunity for habeas review was not sufficiently realistic to bar him from challenging the validity of the deportation order." *Id.* at 70.

### c. Section 1326(d)(3): Fundamental Unfairness

The Court of Appeals ruled that a failure to advise a potential deportee of a right to seek section 212(c) relief can, if prejudicial, be fundamentally unfair within the meaning of section 1326(d)(3). *Copeland*, 376 F.3d at 71. It stated that "[p]rejudice is shown where 'defects in the deportation proceedings may well have resulted in a deportation that would not otherwise have occurred.'" *Id.* at 73 (citing *United States v. Fernandez-Antonia*, 278 F.3d 150, 159 (2d Cir. 2002)). The court stated that the defendant would have to "show that he likely would have been granted Section 212(c) relief if he had obtained a hearing." 376 F.3d at 73. Vacating the dismissal of the defendant's indictment and remanding to the district court for an evidentiary hearing to determine "prejudice" to the deportee, the Court of Appeals declared:

> Because the parties to the present matter could not have anticipated
> the precise nature of our decision, it would not be appropriate for
> us to review the district court's finding of prejudice on the present
> record. Specifically, although the record includes comprehensive
> evidence of Copeland's criminal history, there is little detail about

15

Copeland's family relationships or other potentially favorable considerations. Such evidence would be essential to any finding that Copeland was prejudiced by the lack of a Section 212(c) hearing, given the fact that Copeland's criminal record is quite serious. . . . We therefore *remand* for findings based on a full record – supplemented if necessary by an evidentiary hearing – *on the question of whether Copeland was prejudiced by the IJ's failure to advise him of his right to seek 212(c) relief.*

376 F.3d at 61 (emphasis added).

### III. Law

#### A. Illegal Reentry and Collateral Attack

Section 1326(a) of Title 8 of the United States Code makes it a crime for a deported or removed non-citizen to enter or be found in the United States without the express consent of the Attorney General. Deportation proceedings are not valid and cannot be used to establish a prior order of deportation for purposes of a criminal prosecution if the proceedings failed to afford the non-citizen due process of law. *See United States v. Mendoza-Lopez*, 481 U.S. 828, 839 n.15 (1987) ("Even with this safeguard, the use of the result of an administrative proceeding to establish an element of a criminal offense is troubling."); *see also United States v. Gonzalez-Roque*, 301 F.3d 39, 45 (2d Cir. 2002).

A non-citizen charged with a violation of section 1326 may collaterally attack the validity of a prior deportation order since it is a necessary element of the charged criminal offense. *See* 8 U.S.C. § 1326(d). Such a collateral challenge can be sustained if:

1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
3) the entry of the order was fundamentally unfair.

*See id*. As previously noted, the Court of Appeals held that the defendant satisfied prong one of section 1326(d) by moving to reopen his deportation hearing and appealing the denial of that motion. *See* 376 F.3d at 67. It held that the defendant satisfied prong two by resorting to administrative remedies, where his opportunity for habeas review was not sufficiently realistic to bar him from challenging the validity of the deportation order. *Id.* at 70. The section 1326 question before the court on remand concerns only the third prong, whether the entry of the order was fundamentally unfair and prejudicial.

B. Fundamental Unfairness of Entry of Deportation Order

    1. Standard for Prejudice

An alien attempting to demonstrate on collateral review "that his [deportation] hearing was so fundamentally unfair that it constituted a denial of his Fifth Amendment right to due process . . . *must show both a fundamental procedural error AND prejudice resulting from that error*." *United States v. Fernandez-Antonia*, 278 F.3d 150, 159 (2d Cir. 2002) (emphasis added).

Prejudice is shown where "defects in the deportation proceedings may well have resulted in a deportation that would not otherwise have occurred." *Id.* (internal quotation marks and citation omitted). To satisfy the standard the defendant "must show that he *likely* would have been granted Section 212(c) relief if he had obtained a hearing." *Copeland*, 376 F.3d at 73 (emphasis added). The Court of Appeals did not say what degree of "likelihood," *i.e.* what probability, must be established. It observed that "[w]e have not decided what level of proof is required for a showing that an alien likely would not have been removed, but we have flirted with two possible standards: a 'reasonable likelihood' and a 'plausible showing.'" *Id.*

It concluded that prejudice is shown where there is a "reasonable probability" that the

deportation at issue would not have been ordered absent the error complained of.

> In our view . . . the appropriate test for prejudice is the one used to decide ineffective assistance of counsel claims, namely, prejudice is shown where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This analogy is close-fitting because the denial of an opportunity to apply for Section 212(c) relief will generally be the result either of a lawyer having caused an eligible alien to fail to apply, *United States v. Perez*, 330 F.3d 97, 104 (2d Cir. 2003), or of an IJ, owing special duties to a *pro se* alien, having failed to give notice of such an opportunity, . . . . In the latter case, therefore, *prejudice is shown where there is a reasonable probability that, but for the IJ's unprofessional errors, the alien would have been granted Section 212(c) relief.*

*Id.* (emphasis added). Subsequently, in *United States v. Scott*, 394 F.3d 111 (2d Cir. 2005), the

Court of Appeals expanded *Copeland*'s prejudice analysis by equating "reasonable probability"

with "a probability sufficient to undermine confidence in the outcome."

> Recently, in *Copeland*, we clarified that "prejudice" in the context of § 1326(d) is shown where there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different. As the Supreme Court has defined it, a reasonable probability is a probability sufficient to undermine confidence in the outcome. Is there a "reasonable probability" that [the defendant] would have received a waiver of deportation [at a hearing for] § 212(c) relief in 1996?

*Id.* at 118 (emphasis in original).

2. Quantifying Prejudice

Typically, courts have not quantified burdens of proof. *See* J. MAGUIRE, J. CHADBOURN,

J. MANSFIELD, ET AL., CASES AND MATERIALS ON EVIDENCE 871-73 (6th ed. 1973) (collecting

literature on quantification of burdens of proof); RICHARD H. GASKINS, BURDENS OF PROOF IN

MODERN DISCOURSE 20 (1992) (discussing implications of burdens of proof); TERENCE

ANDERSON & WILLIAM TWINING, ANALYSIS OF EVIDENCE 338 (1991) (correlating verbal and mathematical measures of certainty and doubt).

The term "reasonable probability" should be quantified to the extent possible, given the difficulty of assessing what another adjudicator would have done when applying complex and subjective criteria. One of the most astute observers of problems of proof has emphasized the importance of attempting to set standards of probability in deciding whether fact-finding burdens have been met. He wrote:

> The possible frailty of the fact-finding process in adjudication is an important and complex problem. It threatens to corrode public confidence in a vital part of the legal system; it raises significant moral, ethical, and legal issues . . .; it raises the possibility that legal rules cannot be efficiently or effectively administered and implemented; and it raises broader questions about the fairness, morality, acceptability, and efficiency of matters such as the legislative process and administrative rule-making proceedings. The problem of evidence and uncertainty is not simply a "technical" or "abstract" one. However one proposes to deal with the problem of uncertain inference – whether by "abstract" models, by "common sense" reasoning, by dismissing it as unmanageable by rational analysis, or in some other way – what one thinks about probability and inference in [adjudication] profoundly affects what one thinks about the "rule of law."

Peter Tillers, *Introduction to the Boston University School of Law Symposium on Probability and Inference in the Law of Evidence*, 66 B.U. L. REV. 381, 381-82 (1986). Agreement on quantification, while not a solution, does help move beyond the mere anecdotal to at least a rough consensus in application.

Quantification requires analysis in terms of probability. *Cf.* Anne W. Martin & David A. Schum, *Quantifying Burdens of Proof: A Likelihood Ratio Approach*, 27 JURIMETRICS J. 383 (1987); Peter Tillers & David A. Schum, *Charting New Territory in Judicial Proof: Beyond*

*Wigmore*, 9 CARDOZO L. REV. 907, 910 (1988) ("The primary motivation for the use of most mathematical models of proof is to facilitate consistent thinking about very complex problems.").

While "reasonable probability," the term of art selected by the Court of Appeals, seems deliberately designed to be fuzzy in concept and articulation, it is suggested that a probability of 20% – the approximate inverse of "clear, unequivocal and convincing evidence" – represents a sensible and enforceable standard, considering that deportation often has such serious consequences for the deportee and his or her family.

It has been said that,

> [t]ime is irreversible, events unique, and any reconstruction of the
> past at best an approximation. As a result of this lack of certainty
> about what happened, it is inescapable that the trier's conclusions
> be based on probabilities.

J. MAGUIRE, J. CHADBOURN, J. MANSFIELD, ET AL., CASES AND MATERIALS ON EVIDENCE 1 (6th ed. 1973). *See also United States v. Fatico*, 458 F. Supp. 388 (E.D.N.Y. 1978). In *Fatico*, the court noted: "Quantified, the preponderance standard would be 50% probable. . . . [T]he probabilities might be in the order of above 70% under a clear and convincing evidence burden. . . . In terms of percentages, the probabilities for clear, unequivocal and convincing evidence might be in the order of 80% under this standard." 458 F. Supp. at 405. *Id.* at 411 (concluding that "clear, unequivocal and convincing evidence" means a probability of "about 80%"). *Cf. United States v. Shonubi*, 895 F. Supp. 460, 514 (E.D.N.Y. 1995) ("[Non-statistical] evidence offers nothing more than a basis for conclusions about a perceived balance of probabilities."), *rev'd*, 103 F.3d 1085, 1092 (2d Cir. 1997) ("Though [the district court's] comprehensive opinion is a valuable addition to the legal literature on the subject of evidence in particular and judicial

decision-making in general, we conclude that he relied on evidence beyond the category of 'specific evidence' that our prior opinion ruled was required for determination of a "relevant conduct" drug quantity for purposes of imposing a criminal sentence."); Peter Tillers, *Introduction: Three Contributions to Three Important Problems in Evidence Scholarship*, 18 CARDOZO L. REV. 1875, 1884 (1997) ("One possible way to make sense out of [the opinion of the Court of Appeals in *Shonubi*] is to view it as a condemnation of statistical evidence in general. . . . But there are . . . problems with the view that [the opinion] is, at bottom, a repudiation of statistical evidence and statistical methods. [For instance, the Court of Appeals for the Second Circuit] seems to accept the use of statistics and statistical methods for [related] purposes . . . .").

When, as here, a relatively "simple fact" – what happened in the real world of defendant's life – is combined with what an unknown administrative judge would have done in evaluating the evidence supporting that finding of "fact," and analyzing the "fact" in the context of a "legal rule," the problem of determining how the judge would have decided the "law-fact" issue is complex. It is compounded by many factors – among them the egocentricity of the judge. At most a band of probabilities is all that we can expect. Since the defendant's constitutional rights have been violated he is entitled, it is submitted, to the most favorable band border – here, it is proposed, 20%. An attempt to quantify in order to provide some uniformity in application of the rule is justified even though it must be conceded that the percentage chosen is based on public policy favoring enforcement of constitutional rights and somewhat arbitrary.

The present illegal reentry case involves a potentially unconstitutional deportation of great consequence to a deportee-defendant:

> To be sure, a deportation proceeding is not a criminal prosecution. But it does not syllogistically follow that a person may be banished from this country upon no higher degree of proof than applies in a negligence case. This Court has not closed its eyes to the drastic deprivations that may follow when a resident of this country is compelled by our Government to forsake all the bonds formed here and go to a foreign land where he often has no contemporary identification.

*Woodby v. Immigration & Naturalization Serv.*, 385 U.S. 276, 285 (1966). Unlike a standard deportation case, which would be nominally civil, this case also involves a criminal prosecution. Requiring a petitioner to meet a burden greater than 20% to establish a "reasonable probability" that he would have been granted section 212(c) relief would therefore seem unfair and unreasonable.

C. Means of Determining Prejudice: Balancing Positive and Negative Factors

To establish prejudice, the defendant must show that there is a "reasonable probability" that he would have received section 212(c) relief. Former section 212(c) allowed non-citizens in removal proceedings meeting the statutory criteria to apply for a discretionary waiver of deportation. *See* 8 U.S.C. § 1182(c) (1994). To qualify for such relief, an alien was required to show that he or she: (1) was a lawful permanent resident of the United States; (2) had an unrelinquished domicile of seven consecutive years; and (3) had not committed an aggravated felony for which he or she had served a term of at least five years. *See id.* The Attorney General could exercise discretion to waive deportation of an alien who satisfied these criteria. In the years leading up to 1996, the year the defendant received his deportation hearing, over half of the applications for 212(c) relief were granted. *See INS v. St. Cyr*, 533 U.S. 289, 296 n.5 (2001).

A section 212(c) determination involved a balancing of "the adverse factors evidencing

22

an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf to determine whether the granting of section 212(c) relief appear[ed] in the best interests of this country." *Matter of Marin*, 16 I. & N. Dec. 581, 584 (BIA 1978); *accord Douglas v. INS*, 28 F.3d 241, 244 (2d Cir. 1994).

Adverse factors included the nature and underlying circumstances of the exclusion ground at issue, the presence of additional significant immigration law violations, the existence of a criminal record and its nature, recency and seriousness, and the presence of other evidence indicative of an alien's bad character or undesirability as a permanent resident. *See Marin*, 16 I. & N. Dec. at 584.

Favorable factors included family ties within this country, residence of long duration in the United States, arrival in the country at a young age, evidence of hardship to the non-citizen and the non-citizen's family upon deportation, Armed Forces service, employment history, community service, property or business ties, other evidence attesting to good character, and, in the case of an alien convicted of criminal conduct, proof of genuine rehabilitation. *See id.* at 585.

> Resolution of the prejudice issue . . . is somewhat akin to a trial within a trial. The district court must determine whether there is a reasonable probability that the alien would have obtained relief had he or she been informed of, and sought, a Section 212(c) hearing. The court must first obtain all of the facts relevant to the particular alien and then apply standards established under Section 212(c) to those facts, taking into account actual cases in which similarly situated aliens have been granted or denied discretionary relief.

*Copeland*, 376 F.3d at 73-74.

D.  Unusual or Outstanding Countervailing Equities

The Court of Appeals noted in *Copeland* that "[w]here . . . an alien is deportable by

reason of two narcotics convictions, the alien must make a showing of unusual or outstanding

countervailing equities to obtain a waiver of deportation." *Id.* at 74 (citing *Lovell v. INS*, 52 F.3d

458, 461 (2d Cir. 1995)).

> The necessity of demonstrating unusual or outstanding equities is
> not exclusively triggered by serious crimes involving controlled
> substances, however. Rather, as we indicated in *Marin*, one must
> examine the gravity of the offense, *per se.* In addition, such a
> showing may be mandated because of a single serious crime, as in
> *Marin*, or because of a succession of criminal acts, which together
> establish a pattern of serious criminal misconduct. Finally, we
> observe that an alien who demonstrates unusual or outstanding
> equities, as required, merely satisfies the threshold test for having a
> favorable exercise of discretion considered in his case; such a
> showing does not compel that discretion be exercised in his favor.

*Matter of Buscemi*, 19 I. & N. Dec. 628, 633-34 (BIA 1988). *See also Montilla v. INS*, 926 F.2d

162, 170 (2d Cir. 1991) ("We recognize that petitioner's chances on remand may be slim because

of the high standard he must meet as a narcotics offender to be entitled to a waiver of deportation

under § 212(c) of the Act."). In *Montilla*, the Court of Appeals for the Second Circuit embraced

the BIA's requirement of a showing of unusual or outstanding countervailing equities in the case

of an individual convicted of even one serious drug offense. *See id.*

The BIA has found, *inter alia*, family ties, long residence in the country, arrival at a

young age, emotional hardship to family members upon deportation, gainful employment and

difficult childhood experiences to constitute unusual or outstanding equities. *See Matter of*

*Buscemi*, 19 I. & N. Dec. at 634 ("In his favor, the respondent has shown that he has resided in

this country for some 17 years and that such residence began at a young age. Moreover, the

record reflects that the respondent's entire immediate family resides in this country either as

United States citizens or lawful permanent residents. Furthermore, the respondent has

24

demonstrated that he is closely tied to his family and that all would suffer emotional hardship if the respondent were deported. Finally, we note that the respondent appears to have a history of gainful employment and that he was forced to grow up under difficult circumstances. We consider these to be outstanding equities, particularly with regard to the respondent's 17 years of residence in this country since age 9.").

As illustrated by *Matter of Buscemi*, the presence of unusual or outstanding countervailing equities will not necessarily outweigh adverse factors. *See, e.g., Zaluski v. INS*, 37 F.3d 72, 74 (2d Cir. 1994) (affirming BIA's holding that defendant's "repeated criminal violations constitute a serious adverse discretionary factor," and that, "[w]hile his equities, including lengthy residence, hardship to himself and to his family, and employment ties to the United States rise to the level of outstanding and unusual, . . . they are insufficient to outweigh the seriousness of his criminal activity.").

E. Rehabilitation

"[S]ection 212(c) applications involving convicted aliens must be evaluated on a case-by-case basis, with rehabilitation a factor to be considered in the exercise of discretion." *Matter of Roberts*, 20 I. & N. Dec. 294, 299 (BIA 1991) (considering rehabilitation to be a "significant discretionary factor."). A clear showing of rehabilitation, however, is not an absolute prerequisite to a favorable exercise of discretion in every section 212(c) application involving an alien with a criminal record. *See Matter of Edwards*, 20 I. & N. Dec. 191, 196 (BIA 1990) ("To the extent that [prior] language may be read as creating an absolute prerequisite to a favorable exercise of discretion, we withdraw from it. Rather, section 212(c) applications involving convicted aliens must be evaluated on a case-by-case basis, with rehabilitation a factor to be

considered in the exercise of discretion.").

F. Cases Involving Similarly Situated Aliens

The Court of Appeals instructed the district court in the instant case to "tak[e] into account actual cases in which similarly situated aliens have been granted or denied discretionary relief." *Copeland*, 376 F.3d at 74. The examination of these cases was to be informed by the Supreme Court's broad observation that "over half of all [contemporaneous] 212(c) applications [were] granted." *Id.* (citing *St. Cyr*, 533 U.S. at 296 n.5).

Actual cases were as myriad as the differences in the backgrounds of those seeking section 212(c) relief. Much depended on the particular administrative judge and the dedication and skill of the lawyer assembling his or her client's favorable data. As one experienced attorney explained,

> I'm an attorney with the Legal Aid Society, the only free legal-service organization in New York City that provides assistance to people who are [being deported] because of a criminal conviction.
> . . . .
> In 1986 we deported just under 2,000 immigrants per year for criminal offenses. Last year that number was 79,000. . . . Many of the people being deported have lived here for a long time. Some came here as babies and now have spouses and children. Some have never even seen their native countries. . . .
> I used to be able to leave my work at the office. But now when I'm with my family, my mind is constantly on what I am going to do Monday for this person. I wake up in the middle of the night thinking about a client. I used to paint portraits. I don't do that anymore. . . . In the beginning, I could detach, but when you start getting calls from a guy who's crying uncontrollably and all he's talking about is his kids – you know?

Bryan Lonegan, *My Hands are Tied*, NY TIMES, Nov. 7, 2004. Much appears to have turned on the luck of the draw and the personal view of the hearing officer. *See* Maurice A. Roberts, *The*

*Exercise of Administrative Discretion Under the Immigration Laws*, 13 SAN DIEGO L. REV. 144, 146-47 (1975) ("Theoretically, the evidence submitted . . . is weighed objectively and dispassionately and appropriate fact findings are made on the basis of the persuasiveness of the evidence. Realistically, and especially where the proofs are conflicting, the appraisal of the evidence frequently involves a value judgment, in which the subjective attitudes of the adjudicator can often play a decisive part."). The effect of a given immigration judge's attitude toward non-citizens, particularly those convicted of crimes, cannot be underestimated. *See id.* at 165.

The Court of Appeals has directed a backward-looking theoretical inquiry into what likely would have happened had the defendant in the case now before this court been able to seek section 212(c) relief. The review of actual cases, decided by immigration judges and the Board of Immigration Appeals, as well as by the Court of Appeals for the Second Circuit and the district courts, is instructive.

1. Court of Appeals Cases

a. Illegal Reentry

In *United States v. Scott*, 349 F.3d 111 (2d Cir. 2005), the Court of Appeals for this circuit reversed a conviction of illegal reentry into the United States, holding that the district court erred in denying the defendant's motion to dismiss the indictment on the ground that the underlying deportation order was invalid. In determining whether the defendant was prejudiced by the error in his deportation proceedings, the Court of Appeals reasoned as follows:

> Several factors would have weighed in favor of granting
> § 212(c) relief to Scott in 1996 – fifteen years of residence in New
> York, strong family ties to New York, young age of lawful arrival

27

> in [the] United States, and employment and education in New
> York. According to Scott, his mother would also have testified
> that he is a "good father and a good husband," a "nice caring
> person" who is "willing to help and very considerate," and that he
> was physically abused as a child.
>
> Although the parties dispute the degree of rehabilitation a
> defendant-alien must achieve, Scott makes a legitimate claim under
> any reasonable standard that he could have persuaded an IJ in 1996
> that he was rehabilitated, given his successful completion of the
> [New York State Shock Incarceration Program].
>
> Scott's criminal record as of 1996 would undoubtedly have
> weighed against § 212(c) relief. Prior to being ordered deported in
> 1996, Scott had four convictions, for which he was sentenced to
> five years of probation, three days of community service, two to
> four years imprisonment, and three to six years of imprisonment,
> respectively. In *Perez*, we found that the alien could have made a
> strong showing for § 212(c) relief despite his single conviction for
> a drug trafficking offense, for which he was sentenced to six
> months' imprisonment. Although Scott has a lengthier criminal
> history than Perez, Scott's multiple [automobile theft related]
> crimes were neither violent nor drug-related. Hence, as in Perez,
> Scott's criminal record would not have precluded § 212(c) relief.
>
> There is some indication, as the district court suggested,
> that, given his "lengthy criminal history," Scott may have been
> required to show "unusual or outstanding equities" in his favor.
> However, an alien's strong family ties to the United States in
> addition to his extensive educational and employment histories in
> the United States have, on occasion, been held to outweigh a single
> conviction of third degree drug possession, a crime more serious
> than any of Scott's. Therefore, we are persuaded that Scott's
> multiple convictions for lesser crimes would not have outweighed
> his strong ties to the United States.

*Id.* at 120-21. The defendant in *Scott* had been convicted of grand larceny, after being seen

putting a motorcycle into a stolen van, criminal possession of stolen property, after reportedly

selling two stolen vehicles to an undercover officer, possession of burglar's tools, after being

arrested for attempted auto theft, a separate charge of grand larceny, illegal possession of vehicle

identification plates, and criminal possession of stolen property. The Court of Appeals held that

the district court erred in considering certain *ex post* data in determining prejudice. Even

considering only the information available at the time of the deportation order, as recognized by

the Court of Appeals, the defendant had a "lengthy criminal history."

In *United States v. Calderon*, 391 F.3d 370 (2d Cir. 2004), a defendant moved to dismiss

an indictment charging him with criminal reentry into the country. This court dismissed the

indictment and the Court of Appeals affirmed its dismissal. Mr. Calderon had entered the United

States in 1988 and become a lawful permanent resident in 1990. In 1994, he pled guilty to the

possession of a controlled substance with intent to distribute and was sentenced to probation for

3 years with the condition that he serve 180 days in prison. In 1998 he was convicted of criminal

mischief and assault by automobile and sentenced to a term of imprisonment of 30 days. The

court found that the defendant could "make a plausible showing that had he been granted a

section 212(c) hearing, he would not have been deported, and that the proceeding was

fundamentally unfair." *Id.* at 376 (internal quotations and citation omitted). Specifically, the

district court had found:

> Mr. Calderon can make a plausible showing that had he been
> granted a section 212(c) hearing, he would not have been deported.
> He has strong ties to the United States. He lived in the United
> States legally for approximately ten years. His wife is a long-time
> lawful permanent resident. He had full custody of his son, a
> United States citizen. His criminal history is comparatively less
> serious, and he does not appear to have a history of immigration
> law violations. Arguably, he was, on the whole, a productive
> member of the United States community.

*United States v. Calderon*, 2003 WL 1338943, at *7 (E.D.N.Y. 2003). The United States Court

of Appeals for the Second Circuit concluded that the finding was not clearly erroneous and that

there was no reason to disturb it. *Calderon*, 391 F.3d at 376.

29

In *United States v. Perez*, 330 F.3d 97 (2d Cir. 2003), the Court of Appeals considered

the case of a defendant whose attempted illegal reentry charge was dismissed by the district court

on the grounds of an invalid underlying deportation. The district court had held that the failure

of defendant's counsel to file an application for discretionary relief amounted to ineffective

assistance of counsel. *See United States v. Perez*, 213 F. Supp. 2d 229, 235 (E.D.N.Y. 2002) ("In

a case at the verge of fundamental unfairness, which could lead to a serious criminal prosecution

and a long prison term, due process should be interpreted generously to protect the accused. An

alien is not entitled to any less due process protection than a citizen especially in a proceeding so

important as one which could lead to the devastating punishment to himself and his family of

separation from home and loved ones by deportation.").

The Court of Appeals affirmed the district court's finding that the defendant had shown

his deportation proceedings to be fundamentally unfair as a result of counsel's ineffectiveness.

*Perez*, 330 F.3d at 104. It concluded that Perez had "shown prejudice because he [showed] that

he was eligible for § 212(c) relief and that he could have made a strong showing in support of his

application for such relief." *Id.* at 102. The Court of Appeals applied the *Marin* balancing test,

weighing both positive and negative factors:

> [S]everal factors weighed in Perez's favor: he had a steady history
> of employment, a wife who was a permanent resident, and a son
> who was a United States citizen. The government does not claim
> that any negative factors other than his [single] conviction [for
> attempted sale of a controlled substance] would have weighed
> against him at the time of his deportation. Accordingly, Perez
> could have made a strong showing in favor of § 212(c) relief.

*Id.*

### b. Reviewing BIA Decisions

The United States Court of Appeals for the Second Circuit reviewed section 212(c) decisions by the Board of Immigration Appeals for abuse of discretion, a much higher burden than the "likelihood" standard it imposes in the instant case. *See, e.g., Douglas v. INS*, 28 F.3d 241, 243 (2d Cir. 1994) ("We review the BIA's denial of a section 212(c) application for an abuse of discretion."). A denial of a section 212(c) application was deemed to constitute an abuse of discretion "only if it was 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as an invidious discrimination against a particular race or group.'" *Id.* (citing *Arango-Aradondo v. INS*, 13 F.3d 610, 613 (2d Cir. 1994)).

*Douglas* involved a non-citizen who was admitted to the United States as a lawful permanent resident when he was sixteen years old. All of his immediate relatives resided in the United States and were United States citizens. Four years after his admission to the country, Douglas pled guilty to criminal possession of cocaine. That conviction served to aggravate an already lengthy criminal record. The INS initiated deportation proceedings based on the drug offense. Douglas then appealed to the BIA, arguing, *inter alia*, that the IJ had abused his discretion in denying the section 212(c) application by failing to give adequate weight to positive equities. The BIA affirmed the order of the IJ and dismissed the appeal. Douglas then appealed to the United States Court of Appeals for the Second Circuit, arguing that the BIA had erred because it failed to consider the economic impact of his deportation on his family, failed to consider "meaningfully" the emotional impact of the deportation upon Douglas, and failed to conclude that the positive equities it did consider were unusual or outstanding. 28 F.3d at 243. The Court of Appeals rejected his claims, in part because "Douglas [had] not demonstrated that

the BIA has uniformly considered characteristics such as his to be 'unusual or outstanding.'" *Id.* at 245. The court noted that, "[w]hether such equities should be considered unusual or outstanding depends upon the specific facts of each case viewing the record in its entirety." *Id.*

At issue in *Douglas* was the consideration of unpublished BIA cases. Douglas cited three unpublished opinions of the BIA for the proposition that long-time United States residence, family ties, and emotional and economic hardship to a relative constituted "unusual or outstanding" circumstances meriting weight in the consideration of the section 212(c) application of a convicted narcotics offender. *See id.* at 244. The INS countered that the three unpublished opinions of the BIA cited by Douglas could not be relied upon as precedent. *See id.* at 245. Douglas then observed that the Court of Appeals for the Second Circuit had itself relied upon unpublished BIA opinions in *Vargas v. INS*, 938 F.2d 358, 362 (2d Cir. 1991), in concluding that the BIA's departure from precedent in that case was arbitrary and capricious. The Court of Appeals in *Douglas* clarified that "such decisions should not be relied upon as binding precedent in unrelated matters." *Douglas*, 28 F.3d at 245.

In *Lovell v. INS*, 52 F.3d 458 (2d Cir. 1995), the Court of Appeals held that an immigration judge abused his discretion by not granting a change of venue, but that there was no prejudice, since it did not affect the outcome of the 212(c) determination. The petitioner's criminal record in *Lovell* included two narcotics convictions. The BIA had noted that the petitioner's criminal history was a serious adverse factor weighing heavily against him in the discretionary balancing of factors required by section 212(c). At his deportation hearing, the Court of Appeals observed that the IJ had established "that petitioner came here when he was thirty and had been here but four years when his criminal problems began," and that they

culminated "in two separate drug convictions, state and federal, one for conduct while on bond

from the other." *Id.* at 460. As a result of the two narcotics convictions, the Court of Appeals

determined that it was incumbent on the petitioner to show unusual or outstanding countervailing

equities to obtain a waiver of deportation. *See Lovell*, 52 F.3d at 461. The Court of Appeals

concluded that both the immigration judge and the BIA gave full credit to the petitioner's

positive factors, including a history of employment, though marred by the failure to pay taxes,

strong family ties to the United States, and some evidence of good character. It concluded that

these findings were insufficient to outweigh the adverse factors presented by his two narcotics

convictions, and as a result, the court declined to disturb the decisions of the IJ and the BIA.

In *Zaluski v. INS*, 37 F.3d 72 (2d Cir. 1994), a non-citizen petitioned for review of a final

order of deportation by the BIA. Zaluski contended that the BIA abused its discretion in

dismissing his appeal. The Court of Appeals reviewed the reasoning of the BIA:

> After finding that some of Zaluski's equitable arguments
> were more appealing than the IJ had found them to be, the BIA
> nevertheless held that Zaluski's "repeated criminal violations
> constitute a serious adverse discretionary factor," and that, "[w]hile
> his equities, including lengthy residence, hardship to himself and to
> his family, and employment ties to the United States rise to the
> level of outstanding and unusual, . . . they are insufficient to
> outweigh the seriousness of his criminal activity."

*Id.* at 74. The Court of Appeals reiterated that it would only find an abuse of discretion where

the decision was made without a reasonable explanation, inexplicably departed from established

policies, or rested on an impermissible basis such as an invidious discrimination against a

particular race or group. *See id.* It stated that "[b]ecause we must give considerable deference to

INS decisions, we need only decide whether or not the INS considered the appropriate factors

and came to a decision that has any rational basis." *Id.* (citing *Dhine v. Slattery*, 3 F.3d 613, 619 (2d Cir. 1993)). The Court of Appeals ultimately concluded that "the BIA fully considered all of Zaluski's arguments, carefully weighed all the equities of the case," and as a result, "[found] no abuse of discretion in this case." *Id.*

In *Arango-Aradondo v. INS*, 13 F.3d 610 (2d Cir. 1994), the Court of Appeals held that a denial of a waiver of deportability did not constitute an abuse of discretion. The deportation in *Arango-Aradondo* was prompted by a 1990 plea of guilty to attempted criminal sale of a controlled substance in the third degree, which resulted in a sentence of three to six years imprisonment. *See id.* at 610. Viewed in its entirety, Arango-Aradondo's criminal record included, *inter alia*, "twenty-one arrests, seven convictions and multiple extended periods of incarceration." *Id.* at 611-612. The Court of Appeals declined to disturb the determination of the IJ and the BIA's affirmance of that decision:

> In this case, it is evident that the immigration judge carefully and thoroughly weighed the evidence in Arango's favor (including his drug and alcohol rehabilitation efforts, his longtime residency in the United States, his close family ties, and the hardship he will endure in Colombia given his HIV status and his lack of ties there) against the detrimental evidence (including his sporadic employment record, his failure to file taxes, and, most importantly, his "very lengthy and very severe" criminal record together with his long involvement in drug culture). Based on these considerations, the judge concluded that "the positive factors presented just do not outweigh the adverse factors." Since the judge considered the evidence presented by Arango, we are not empowered to reweigh the evidence and second guess his determination.

*Id.* at 613.

In *Rabiu v. INS*, 41 F.3d 879 (2d Cir. 1994), the Court of Appeals held that the failure of

a non-citizen's lawyer to timely file an application for a section 212(c) waiver of deportation

constituted ineffective assistance of counsel. Before it could find that the attorney's failure to file

caused the defendant actual prejudice, the district court indicated that the defendant was required

to "make a prima facie showing that he would have been eligible for the relief and that he could

have made a strong showing in support of his application." *Id.* at 882. It decided:

> Rabiu made a *prima facie* showing that he was eligible for
> relief under section 212(c) in his brief to the BIA. He alleged that
> he arrived in the United States when he was nine years old and that
> he has resided continuously in the United States for the past fifteen
> years as a lawful permanent resident, well over the statutory
> minimum of seven years. He alleged that his father, sisters and
> cousins all reside in the United States, giving him substantial
> family ties to the United States. He also alleged that he has a long
> history of employment, and that he has made efforts to rehabilitate
> himself while in prison by obtaining an associate degree certificate.
>
> . . . .
>
> Rabiu . . . would have been eligible for relief had his
> section 212(c) application been filed, and . . . he was a strong
> candidate for that relief.

*Id.* at 883 (citation omitted). The Court of Appeals came to this conclusion despite the fact that

the defendant "was convicted of an aggravated felony and sentenced to five years'

imprisonment." *Id.* It reversed the BIA's denial of Mr. Rabiu's appeal and remanded to the IJ to

allow him to file for a waiver of inadmissibility pursuant to section 212(c).

In *Vlassis v. INS*, 963 F.2d 547 (2d Cir. 1992), a non-citizen petitioned for review of an

order of the BIA denying his application for a stay of deportation. The Court of Appeals held

that the resident who was subject to deportation for violating narcotics laws was not entitled to a

discretionary waiver of deportation. The court considered that in December of 1981, Vlassis pled

35

guilty to a charge of unlawful possession of cocaine, quaaludes, and marijuana, and was

conditionally discharged. In May of 1985, he was convicted upon a plea of guilty to a charge of

attempted criminal sale of marijuana and was fined $100. Less than six months later, in

November of 1985, he pled guilty to a charge of criminal sale of marijuana and was fined $200.

In April of 1986, he was named in a sixteen-count indictment charging various narcotics

violations. In July of 1986, he pled guilty to one count alleging criminal sale of cocaine in the

third degree and was sentenced to a one to three year prison term. The Court of Appeals in

*Vlassis* reasoned:

> At the outset, Vlassis appeared to be a likely candidate for waiver.
> Born in Greece in 1960, he came to the United States with his
> parents in 1967 and has resided in this Country ever since. He
> speaks little Greek and has only one known relative in Greece.
> However, these equities quickly were outweighed by adverse
> factors.

*Id.* at 550. With the exception of the identified equities, the court found that Vlassis presented a

relatively weak case for discretionary relief:

> His employment record was suspect, his claim being that he
> worked mainly for members of his family and often was paid "off
> the books." He claimed to have received a high school
> equivalency diploma during his incarceration and to have received
> substance abuse counselling [sic]. However, no family members
> testified on his behalf, and he submitted no documentary evidence
> in support of his claim of rehabilitation. Accordingly, he was
> granted a continuance to produce both witnesses and supporting
> documents. [The IJ] wanted to see an up-to-date parole officer's
> report, a report showing Vlassis' attendance at drug counselling
> [sic] sessions, tax returns for the years Vlassis claimed to have
> been working, a certificate of dismissal from parole and an up-to-
> date police record. [The IJ] adjourned the hearing so that this
> evidence could be produced.
> At the next hearing . . . Vlassis produced none of the
> requested documents or witnesses, and the matter was adjourned

36

> again . . . . At the [next] hearing, the requested documentary
> evidence still was not produced. Vlassis' mother did appear and
> testify. Her testimony did little to bolster her son's case, as it did
> not appear that she and her son were very close. She did not know
> that he had a drug problem or that he had been arrested three times
> prior to his 1986 conviction.
>
> Not surprisingly, [the IJ] concluded that Vlassis had not
> established that he had rehabilitated himself from his drug-related
> problems so that the social and humane considerations in his favor
> were not outweighed by the undesirability of permitting him to
> remain a permanent resident.
>
> In an eight-page order which recited at length the facts and
> findings below, the BIA . . . dismissed Vlassis' appeal . . .
> demonstrating thereby a complete knowledge of the facts and the
> applicable law. Its reasoning followed very closely that of [the IJ]
> and is persuasive.

*Id.* at 550.

In *Vargas v. INS*, 938 F.2d 358 (2d Cir. 1991), a non-citizen appealed the BIA's dismissal

of his motion to reopen the denial of a waiver of deportation. The IJ had found the petitioner

eligible for relief under section 212(c), and had acknowledged that he had strong family ties in

the United States. She denied discretionary relief, however, based on his criminal record and a

weak showing of rehabilitation. The petitioner appealed from the IJ's decision to the BIA, which

then dismissed his appeal. While the BIA acknowledged that the "petitioner presented

'outstanding equities,' including strong family ties in the United States and no possibility of

livelihood in the Dominican Republic," *id.* at 360, it nevertheless denied relief based on his

criminal record and slim evidence of rehabilitation. Some time later, petitioner moved to reopen

the BIA's denial of relief under section 212(c), and sought "to present new evidence concerning,

among other things, his employment history, continued law-abiding conduct, independence from

drugs, and family life, including the birth of a child." *Id.* The Court of Appeals held that the

decision of the BIA denying the motion to reopen the denial of the waiver of deportation, based on a prior BIA decision, was not the product of reasoned decision-making, and vacated the BIA decision. In so doing, it relied on two unpublished decisions of the BIA to find that the decision in petitioner's case was arbitrary and capricious. *See id.* at 362. This approach arguably was later disapproved in *Douglas*, as discussed *supra*.

### 2. District Court Cases

In *United States v. Garcia-Jurado*, 281 F. Supp. 2d 498 (E.D.N.Y. 2003), a non-citizen moved to dismiss a count of illegally reentering the United States after deportation for an aggravated felony. He argued that his deportation was unlawful because he was improperly denied an opportunity to seek discretionary relief under section 212(c). The court agreed, finding actual prejudice based on the conclusion that the deprivation of judicial review may well have resulted in a deportation that would not otherwise have occurred:

> Garcia-Jurado claims that he would have been a good candidate for a § 212(c) waiver of deportation. Indeed, he would. Garcia-Jurado has lived here since he was a teenager. He has strong family ties in this country: a mother, stepfather and two half-sisters who are United States citizens. He also has two other siblings who are legal permanent residents, and, importantly, a daughter who is a citizen. He attended high school here, [and] was employed for a year prior to his arrest. He also received a GED and vocational training in prison, and was employed as a machine operator after his release from prison up to the time he was deported. Garcia-Jurado has also submitted an affidavit by [his attorney], who represented him throughout the deportation process, claiming that in his experience representing over 75 aliens at § 212(c) hearings, aliens with equities similar to Garcia-Jurado were reasonably likely to receive § 212(c) relief.
>
> As to adverse factors, other than the conviction itself, the government has not argued that any of the adverse factors weighed against Garcia-Jurado. Moreover, as the Supreme Court noted in *St. Cyr*, 51.5% of the [section 212(c)] applications for which a final

decision was reached between 1989 and 1995 were granted. Nothing in the record indicates that Garcia-Jurado's circumstances were such that would place him outside this statistical norm.

Garcia-Jurado has, therefore, shown that he was prejudiced by the deprivation of judicial review given that it was reasonably likely, and certainly plausible, that he would have received § 212(c) relief. Accordingly, Garcia-Jurado has shown that in addition to being deprived of an opportunity for judicial review, his deportation was fundamentally unfair.

*Id.* at 515 (internal quotation omitted).

In *United States v. Frias-Gomez*, 262 F. Supp. 2d 11 (E.D.N.Y. 2003), a non-citizen moved to dismiss a charge of attempted illegal re-entry. The district court held that the defendant's prior deportation proceedings violated his due process rights by improperly denying him the opportunity to apply for discretionary relief from deportation. The reasoning for this prejudice determination was as follows:

Mr. Frias-Gomez can make a plausible showing that these errors prejudiced him. He was statutorily eligible for a waiver of deportation under former section 212(c). He was a lawful permanent resident, had lived in the United States for more than double the seven consecutive years required, and served a term of imprisonment of less than five years.

If Mr. Frias-Gomez had been granted a section 212(c) hearing, there is a strong possibility that he would not have been deported. He had strong ties to the United States. He entered the United States as a lawful permanent resident at the age of 11 and lived in the United States until his deportation, a period of more than fifteen years. His large family, with whom he is close, has also lived in the United States for an extended period of time. He apparently has no family or close friends in the Dominican Republic. He has a thirteen year old citizen daughter in the United States with whom he would like to build a relationship. Before his conviction, he was steadily employed and a contributing member of the community. Although the crime for which he was deported [– possession of a controlled substance with intent to distribute in the third degree –] is a serious one, it is not heinous and is essentially his only criminal history, arguably constituting an

39

aberration for immigration purposes.

*Id.* at 16-17.

### 3. Board of Immigration Appeals

#### a. Precedential Cases

The BIA would hear appeals from immigration judge decisions granting or denying

section 212(c) relief. Its review of such decisions was *de novo*.

> The Board of Immigration Appeals has . . . been questioned
> concerning the standard of review we utilize when considering a
> discretionary decision of the immigration judge, such as the section
> 212(c) application in the instant case. Specifically, we have been
> questioned about the relationship between the Board and the
> immigration judge in terms of discretionary authority.
>
> We state at the outset that when the Board engages in a
> review of a discretionary determination by an immigration judge,
> we rely upon our own independent judgment in deciding the
> ultimate disposition of the case. . . . The authority of the Board to
> issue a discretionary decision independent from that of the
> immigration judge has been recognized by the federal courts.
> Thus, we do not employ an abuse of discretion standard when
> reviewing discretionary determinations of immigration judges.
>
> The advantage of an independent standard of review is that
> it promotes uniformity in the application of various discretionary
> provisions . . . . If our review were limited to questioning whether
> an immigration judge abused his or her discretion, we would be
> unable to remedy [disparities caused by differing decisions on
> virtually identical facts]. However, by utilizing our own
> discretionary authority, there exists a forum available to promote
> uniformity of result.
>
> . . . .
>
> Finally, we acknowledge that questions concerning our
> standard of review were invited by occasional decisions of the
> Board which concluded that the immigration judge "did not abuse
> his discretion." We agree that the use of this and similar language
> can be misleading. However, such language is attributable to
> inartful drafting rather than to a limited review of the record on the
> part of the Board. . . .

40

*Matter of Burbano*, 20 I. & N. Dec. 872, 873-74 (BIA 1994). *See also* Jeffrey L. Romig,

*Administrative Review of Cases Involving the Exercise of Discretion Under Section 212(c):*

*Should the Board of Immigration Appeals Adopt an "Abuse of Discretion" Standard?*, 9 GEO.

IMMIGR. L.J. 63 (1995) ("The BIA's practice of applying a *de novo* standard of review in

exclusion and deportation cases has its origin in a decision issued forty years ago. . . . The BIA's

observation in 1969 that it has 'plenary power to make a *de novo* review of the record and based

on such a review make its own independent findings on questions of fact and law irrespective of

those made by the special inquiry officer,' stands today as a succinct statement of the review

authority which the BIA may exercise in exclusion and deportation cases.") (citing *In re*

*Vilanova-Gonzalez*, 13 I. & N. Dec. 399, 402 (BIA 1969)).

  The BIA would exercise its independent review authority to re-weigh the positive and

adverse factors that were considered by the immigration judge in the first instance. Instructive

decisions whose fact patterns may not closely mirror the facts of the instant case also bear

consideration. They will be treated in chronological order.

  *Matter of Marin,* discussed above, set forth the balancing test of positive and adverse

factors to be employed in section 212(c) determinations. 16 I. & N. Dec. 581 (BIA 1978). The

applicant was a 46-year-old Colombian citizen who pled guilty to the felony of criminal sale of

cocaine. The immigration judge concluded that the respondent had failed to establish that a

waiver of deportability was merited as a matter of discretion. He determined that given the

criminal conduct at issue, a narcotics conviction, a waiver should not be granted absent a

showing of "unusual or outstanding equities." *Id.* at 583.

  Other than his residence in the United States for 12 years, however,

the respondent was "unable to advance any substantial equities."
He was single, childless, and had no relatives residing in this
country. His closest relatives (a brother and sister) both lived in
Colombia. The respondent's employment history was sporadic and
he presented no evidence that he would have particular difficulty
returning to Colombia other than stating that "life [was] too hard
there."

*Id.* at 583. Based on the record as a whole, the immigration judge concluded that the

respondent's conviction as a drug offender had not been sufficiently offset by his twelve years of

residence in the United States and his adjustment to prison life so as to warrant the granting of

discretionary relief. *See id.* The BIA affirmed, stating that,

[t]he Board has not adopted an inflexible test for an immigration
judge to use to determine as a conclusory matter whether section
212(c) relief should be granted as a matter of discretion. The
undesirability and "difficulty, if not impossibility, of defining any
standard in discretionary matters of this character which may be
applied in a stereotyped manner" has long been recognized.
Instead, it has been held that each case must be judged on its own
merits.

16 I. & N. Dec. at 584 (citation omitted).

*Matter of Buscemi*, 19 I. & N. Dec. 628 (BIA 1988) involved an application for section

212(c) relief. The non-citizen was a single, 26-year-old native of Italy whose crime was the

attempted criminal sale of the controlled substance heroin. The applicant had resided in the

United States since 1970, his entire immediate family resided in the United States, he had helped

to support his family, and he had served as a father figure to his four siblings since they were

abandoned by their biological father in 1975. The respondent submitted copies of letters and

affidavits from his former neighbors and employer testifying to his good character. The IJ denied

the application for section 212(c) relief, concluding that the respondent had not demonstrated the

outstanding equities and genuine rehabilitation necessary to merit relief in the face of a serious

criminal record. The BIA concluded:

> Even considering the outstanding equities which the respondent
> has been able to establish, we do not find that granting relief is
> warranted or in the best interests of this country. In reaching this
> conclusion, we have evaluated the respondent's equities against the
> serious adverse factors present in his case and our determination
> that he has not demonstrated rehabilitation. While his deportation
> may well involve hardship to himself and certainly much
> unhappiness for his family, the responsibility for this result rests
> with the respondent alone.

*Id.* at 635-36.

*Matter of Edwards*, 20 I. & N. Dec. 191 (BIA 1990), involved a 44-year-old native and

citizen of Barbados, who had been admitted to the United States twenty-two years earlier. He

had married a United States citizen and had four citizen children. His criminal record included:

attempted burglary (1977); third degree burglary, larceny, possession of burglary tools, and

possession of stolen property (1979); attempted burglary (1981); possession of a controlled

substance (1985); and two counts of possession with intent to distribute a controlled substance,

three counts of intentional distribution of a controlled substance, and a single count of conspiracy

to distribute a controlled substance (1987). Edwards pleaded that his wife and children, as well

as his mother and siblings, resided in the United States and that he knew no one in Barbados.

His employment history was presented as a positive factor, although he acknowledged that he

was unemployed during the period leading up to his 1987 convictions, and that he had sold drugs

while his wife was supporting him. Finally, he explained that his wife would be unable to

accompany him to Barbados because the country lacked special education facilities for his

autistic son.

The immigration judge denied relief, reasoning that the serious negative factor of the respondent's criminal convictions could only be overcome by a showing of unusual or outstanding equities, together with a demonstration of rehabilitation. The BIA clarified its position with respect to a requirement of rehabilitation:

> With respect to the issue of rehabilitation, the Board noted in *Matter of Marin* . . . and reiterated in *Matter of Buscemi* . . . that a section 212(c) waiver applicant who has a criminal record "ordinarily" will be required to make a showing of rehabilitation before relief will be granted as a matter of discretion. This language has been interpreted in some cases as though a clear showing of reformation is an absolute prerequisite to a favorable exercise of discretion in every case involving an alien with a criminal record. To the extent that this language may be read as creating an absolute prerequisite to a favorable exercise of discretion, we withdraw from it. Rather, 212(c) applications involving convicted aliens must be evaluated on a case-by-case basis, with rehabilitation a factor to be considered in the exercise of discretion.

*Matter of Edwards*, 20 I. & N. Dec. at 196. While it made clear that rehabilitation is not a threshold requirement for non-citizens with criminal convictions, the BIA did take rehabilitation into account as a factor in reaching its ultimate conclusion with respect to the applicant in *Matter of Edwards*:

> In balancing the various factors of the respondent's case, we take note of his favorable equities, which we found to be unusual or outstanding. However, when we weigh these equities against the adverse factors of his extensive criminal record, which includes controlled substance distribution offenses, and our lack of confidence as to his rehabilitation, we determine that a favorable exercise of discretion is not warranted.

*Id.* at 198-99.

In *Matter of Roberts*, 20 I. & N. Dec. 294 (BIA 1991), the BIA, conducting a *de novo*

review, overturned an immigration judge's grant of section 212(c) relief. The IJ had determined that relief was warranted in the exercise of discretion. He reasoned that the serious negative factor of a criminal conviction for the sale of a controlled substance, cocaine, had been overcome by the respondent's period of residence in this country, his family ties, the hardship that deportation would impose on his family, his clean criminal record prior to and after his conviction, and his history of employment. The IJ also reasoned that a single conviction for the sale of cocaine did not constitute drug trafficking and that some of the facts presented raised the possibility of entrapment.

The BIA rejected the immigration judge's conclusion, first deciding that a single conviction for the sale of narcotics sufficiently established trafficking. As to the question of entrapment, the BIA observed that "[w]hile inquiry may be had into the circumstances surrounding the commission of the crime in order to determine whether a favorable exercise of discretion is warranted, it is impermissible to go behind a record of conviction to reassess an alien's guilt or innocence." *Id.* at 301. In weighing the positive and adverse factors considered by the IJ *de novo*, the BIA reasoned:

> We find that the respondent's conviction for sale of cocaine constitutes an extremely serious adverse factor. As such, the respondent must demonstrate unusual or outstanding equities if he is to have the possibility of receiving a favorable exercise of discretion on his waiver application. We conclude that the respondent has not demonstrated unusual or outstanding equities so as to offset the serious adverse factors in his record.
>
> In the respondent's favor, we take into account the fact that he has resided in the United States for approximately 12 years. However, we do not find that this period is so lengthy as to constitute an unusual or outstanding equity, particularly where the respondent was an adult when he was first admitted to this country as a lawful permanent resident. The majority of the respondent's

family reside[s] in New York, and although none of them appeared to testify on his behalf, they did submit letters in support of his waiver request. We note that although the respondent has many close relatives residing lawfully in the United States, he has been separated from his wife and their four children since 1987. Further, he admitted that he did not call or write to his wife since he was convicted in 1989. In addition, the respondent testified that he is not sure of the whereabouts of his 2-year-old son but believes that he is in the custody of the child's maternal grandmother, who supports him from her welfare income. In terms of the financial difficulties that his family may face due to his deportation, we note that none of the respondent's family appear to rely on him for financial support. The respondent admitted that between 1987 and 1989, he provided only occasional support of a minimal amount, and that since 1989, he has provided no support at all. In addition, his testimony regarding his 2-year-old son indicates that he does not provide any support for him. Therefore, the respondent has not shown that his family's financial situation will be materially altered if he is forced to depart from this country.

We do not consider the respondent's employment history to be an unusual or outstanding equity. The irregularity of his employment between 1987 and 1989 certainly impairs the significance of this factor. The respondent admits he has paid no income taxes since 1986. Additionally, he did not demonstrate that he has any business or property ties to this country. The respondent merely asserts that he would not be able to afford tools or real estate in Jamaica. Aside from this statement, he did not present any evidence that he would have difficulty residing in Jamaica. In fact, the respondent testified that he may have relatives living there, including his father and his aunt.

On the other hand, the respondent was convicted of [the] sale of cocaine, an aggravated felony . . . .

After balancing the respondent's equities, which we do not find to be unusual or outstanding, against the adverse nature of his serious criminal conviction for the sale of a controlled substance, and our lack of confidence as to his rehabilitation, we conclude that he has not demonstrated that he warrants a favorable exercise of discretion.

*Id.* at 302-303.

In *Matter of Coelho*, 20 I. & N. Dec. 464 (BIA 1992), the BIA entertained an appeal by a